If a ship is driven by stress of weather into a port out of her course, the charge of the cargo devolves upon the master, whose duty it is to take proper care of it. Such goods as are damaged, or are of a perishable nature, he has power, without reference to the ship, to sell. But those which are in good condition, & not perishable, he has no such right to sell without the order of the owner, to whom he is bound to give immediate information. If contrary to this duty he sells, he is personally answerable.

SMITH and another *against* MARTIN.

THIS cause was tried before the Chief Justice at a *Nisi Prius* in *February* last, when a verdict was given for the defendant; and now, upon a motion by the plaintiffs for a rule to shew cause why there should not be a new trial, his Honour reported the case to be as follows:

The action was brought against the defendant as master of the ship *Volunteer*, for not delivering to the plaintiffs or their assigns at *Philadelphia*, 230 barrels of refined saltpetre, agreeably to a bill of lading signed by him in *London* on the 21st of *October* 1808, and for unlawfully selling the same at *St. Thomas*. The invoice price of the saltpetre was 1067*l.* 1*s.* 4*d.* sterling. It was valued in a policy by the *Phœnix Insurance Company* at 8500 dollars, and for their use the present action was brought, they having paid the plaintiffs a total loss, and received an assignment.

The vessel by great stress of weather, and in consequence of much injury from storms and tempests, was obliged to take refuge in the island of *St. Thomas*, where she arrived in the month of *February* 1809. Surveys were held upon ship and cargo in the same month, by which the former

was condemned as unseaworthy, and the latter, expressly including the saltpetre, was stated to be generally damaged by sea water. It was therefore thought advisable to sell; and accordingly the entire cargo was sold at public auction between the 3d and 16th of *March*, the saltpetre producing very little. There was no supercargo on board, and the defendant applied for advice to Messrs. *Badderack* a house of the first respectability in the island. The cargo, excepting the saltpetre and some books, sold pretty well.

The plaintiffs, and others who were owners of parts of the cargo, having heard of the ship's arrival at *St. Thomas*, despatched *J. W. Perit* as their special agent, with full powers to act as might be necessary. He was intrusted by the plaintiffs to bring the saltpetre to *Philadelphia*, unless it should be damaged, or would bring 30 cents a pound on the spot. When he arrived at *St. Thomas*, which was in *April*, he found that the entire cargo had been sold, and that the defendant, having settled his accounts with Messrs. *Badderack*, was about to depart to the *United States*, with bills of exchange to the amount of the net proceeds; and either by persuasion, or the menace of a suit, he prevailed on the defendant to remit the bills to Messrs. *Guest* and *Bancker* of *Philadelphia*, accompanied by a letter; in which he made an appropriation of different sums to different persons, according to their respective interests in the cargo. At the same time, Mr. *Perit* as the attorney of those persons, gave a written engagement to the defendant, by which it was stipulated that in consequence of the whole proceeds having been remitted, his constituents should pay to the defendant the amount of his lawful claim for freight, services and expenses.

The evidence as to the damage done to the saltpetre, was rather contradictory. Mr. *Perit* swore that the surveyors of the cargo were men of the first respectability; that he saw part of the saltpetre which he considered to be damaged, but he did not examine it very particularly; that he did not know that he should have sold it, as it was in a condition in which it might have been brought to *Philadelphia;* that it was in bulk when he saw it. Saltpetre, he stated, is not a perishable article, the part not damaged remaining good as before. That he did not know any vessel that the defendant could have got to come to *Philadelphia*, the vessels

1814.

SMITH
et al.
*v.*
MARTIN.

there being embargo breakers. He did not consider himself as finishing the business with the defendant, at *St. Thomas*, but as leaving it to be concluded at home. Shortly after his arrival in the island he wrote to his principals, that the conduct of the defendant appeared to have been correct and judicious, and so it then seemed to him. On the other hand it appeared that the saltpetre, which was sold for 7 dollars the keg, was exposed in bulk to the sun and air; that it was then repacked, when about 10 kegs were lost out of the 230, and the residue proved good and merchantable, and was sold for 25 dollars the keg.

The *plaintiffs'* counsel contended before the jury, that the sale was unlawful; because, as the article was not perishable, as the damage it had received was little or nothing, and as the master did not want money to repair the ship, she being condemned and sold, his duty was to store the saltpetre, and give notice to the owners. He had therefore made himself liable by his misconduct. They relied upon the following authorities. *Abbot on Ship.* 158., 2 *Condy's Marsh.* 171 note. The *Gratitudine* (a), *Vanomeron* v. *Dowick* (b), *Hunter* v. *Prinsep* (c).

The *defendant's* counsel contended that the master had acted like a prudent agent, and within the scope of his authority; that the saltpetre was generally damaged, and therefore within the plaintiffs' rule he had a right to sell; but that independent of this, as the voyage was fairly broken up, and the cargo was miscellaneous and principally damaged, the master was not bound to preserve the particular parts not damaged, but might sell the whole. The breaking up of the voyage made the difference. For this they cited *Mills* v. *Fletcher* (d), 2 *Marsh.* 615., 1 *Marsh.* 170., *Manning* v. *Newnham* (e), and also relied on the plaintiffs' authorities.

They also contended that the plaintiffs were barred from recovery by the act of their agent, in relation to the bills, and by their own receipt of the proceeds of the saltpetre.

The *Chief Justice* reserved the last point, instructing the jury to consider it as decided in favour of the plaintiffs. As to the main question, he instructed them in the law, as it is hereafter stated in his opinion; and concluded by saying, that if the saltpetre was in their opinion so much

(a) 3 *Rob.* 196.     (c) 10 *East* 378.     (e) 2 *Marsh.* 586.
(b) 2 *Campb.* 42.     (d) *Doug.* 219.

damaged as to make a sale expedient, they should find for the defendant, otherwise for the plaintiffs.

1814.

SMITH
et al.
v.
MARTIN.

The motion for a rule to shew cause, was argued by *Hallowell* and *Rawle* for the plaintiffs, and by *Phillips* and *Dallas* for the defendant; the single point being whether the verdict was against evidence.

TILGHMAN C. J. after stating the case particularly, delivered his opinion as follows:

I told the jury that the ship having been driven out of her course by stress of weather, the charge of the cargo devolved upon the master, whose duty it was to take proper care of it. In such case, the master has power to sell goods which are damaged or of a perishable nature. But those which are in good condition and not perishable, he has no right to sell without the order of the owners, to whom he is bound to give immediate information. This is a principle, which it is of great importance to support, because it would be of ruinous consequence, if the captain might at his pleasure sacrifice valuable goods, by exposing them to sale at an improper market, especially as there will never be wanting persons, whose interest it is to advise a sale, by which they will be sure to reap considerable profit. But whether the saltpetre in this case, was so much damaged as to render a sale expedient, was a matter which I submitted to the jury, as the turning point of the cause. That it was damaged is certain. So say all the witnesses, both for the plaintiffs and defendant. It is certain also, that after being thrown into bulk and exposed to the sun and air, about ten kegs out of the 230 were lost, and the remainder proved good and merchantable. But the trouble of restoring it to good condition, was taken by the purchaser at *St. Thomas*, who resold it at a great advance. There is every reason to suppose, that the defendant acted fairly and to the best of his judgment, aided by the advice of respectable persons whom he consulted. It is of some consequence too, that Mr. *Perit* wrote to his constituents after his arrival at *St. Thomas*, that the conduct of the defendant had been *correct* and *judicious*. I have no doubt, but it would have been more for the plaintiffs' interest, if the saltpetre had not been sold; but it must be confessed that the defendant stood in a criti-

1814.

SMITH
et al.
v.
MARTIN.

cal situation; for if he had stored it, after the report of the surveyors, and the opinion of other intelligent persons in favour of a sale, and then it had been lost by fire or other accident, he might have found it difficult to justify his conduct. At any rate the jury having found, that the state of the saltpetre rendered a sale expedient, it is not one of those cases in which they were so clearly mistaken as to induce the Court to order a new trial. Whether the acceptance of the proceeds of sale by the plaintiffs was such an affirmance of the defendant's conduct as would be a bar to this action, even supposing the sale to have been illegally made, it is unnecessary to determine. I am of opinion, that the plaintiffs' motion for a rule to shew cause, should not be granted.

YEATES J. and BRACKENRIDGE J. concurred.

Rule refused.